**In re Kevin M. BELMONTE and Piper L. Belmonte, Debtors.**

**Bankruptcy No. 99–18111SR.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Nov. 17, 1999.

David Randolph Balck, Media, PA, for debtor.

Daniel K. Astin, Philadelphia, PA, Office of the U.S. Trustee.

Frederick L. Reigle, Reading, PA, Chapter 13 Trustee.

## OPINION

STEVEN RASLAVICH, Bankruptcy Judge.

### INTRODUCTION

Before the court is a motion filed by Mildred Belmonte requesting relief from the automatic stay so that she may regain possession of a parcel of residential real estate from her son, Kevin Belmonte, who is one of the joint debtors in the above

captioned bankruptcy case. A central issue in the case is the preclusive effect of a prepetition state court decision in which Kevin was found to have no continuing legal or equitable interest in the real estate. The Court concludes it is bound by the state court decision and further concludes that without a legal or equitable interest in the property Kevin is without recourse under Chapter 13 of the Bankruptcy Code to reorganize his affairs in a manner that allows for the property to be retained. The motion for relief from stay must therefore be granted.

### BACKGROUND

The Debtors filed for Bankruptcy under Chapter 13 on June 24, 1999. By August 26, Mildred Belmonte filed a motion for relief from the automatic stay. A hearing was held on the motion on September 22, and post-trial briefs have been received from each party.

The facts developed at the hearing show that on April 1, 1992, Mildred Belmonte entered into a contract to sell a parcel of residential real estate at 321 Old Morehall Road, Malvern, Pennsylvania, to her son Kevin Belmonte. The total sale price was $ 110,000, payable in monthly installments of $600, with $2,600 due upon execution of the agreement. Payments were to continue until a mutually agreed settlement date. Following execution of the agreement, Kevin took possession of the property. Sometime later a dispute developed between the parties over the payments. Mildred claimed that certain payments had not been made, and Kevin responded with the accusation that Mildred was refusing to accept payments. In any event, by the date of a State Court hearing concerning the dispute, Kevin acknowledged he was in arrears to Mildred by about $12,000.

At some point during Kevin's tenure in possession of the property he leased it to tenants for the sum of $800 per month. The tenancy ended, however, when Mildred obtained a judgment for possession of the property against the tenants. Following the tenants removal, Mildred changed the locks in an attempt to permanently dispossess Kevin. Kevin, nevertheless, regained entry to the premises and initiated his own law suit against Mildred. The specifics of the law suit have not been revealed, but the Court can surmise that Kevin asserted claims against Mildred based on her attempt to remove him from the property.

The law suit gave rise to a bench trial before the Honorable Paula Francisco Ott in the Chester County Court of Common Pleas. Judge Ott issued a memorandum decision resolving the case dated May 28, 1999, just prior to the bankruptcy filing. In the decision, Judge Ott indicated that the "gravamen of the issue before me is whether there existed a valid agreement of sale and whether there was a breach of that agreement." *Belmonte v. Belmonte*, No. 97–01022, slip op. at 1 (Chester Co. Pa., May 28, 1999). The Court concluded that a valid agreement existed, and that Kevin Belmonte committed a breach of the agreement in June 1996 by failing to make the payments required thereunder. As a result of the breach, the Court further held that the agreement of sale was null and void, each party was released from any additional obligation thereunder, and Kevin had "no legal, equitable or possessary [sic] right to the property." *Id.,* slip op. at 5. The Court also ruled that the agreement was not an installment land contract under the Pennsylvania Installment Land Contract Law, 68 P.S. §§ 901–911, because it did not concern land within the geographic area to which that statute applies.

Following issuance of the decision, the Debtor claims to have filed a motion for post-trial relief. That motion, however, was not resolved as of the date of the bankruptcy filing and, as far as the Court has been made aware, remains outstanding to the present.

Mildred argues she should be granted relief from the stay because there is no

debtor-creditor relationship between the parties following issuance of the Common Pleas Court decision. She also relies on the State Court holding that the agreement is not governed by the Pennsylvania Installment Land Contract Law, 68 P.S. §§ 901–911, to support her argument that the agreement should be classified for bankruptcy purposes as an executory contract, i.e., something which must be assumed or rejected, rather then a security agreement that could be cured over the life of a plan and thereby reinstated.

The Debtor counters by arguing that the Common Pleas Court decision was not entered as a "final judgment," and is thus not conclusive on any issue. The Debtor also argues that the sale agreement constitutes a security instrument capable of being cured.

## DISCUSSION

The key issue in this case is whether the Debtor retained an interest in the real estate on the date of the bankruptcy filing sufficient to invoke rights under Chapter 13 to cure the default and reinstate the agreement of sale. The first step in answering this question is to determine what preclusive effect, if any, must be accorded the conclusion of the Common Pleas Court that the Debtor possesses no legal or equitable interest in the property.

### I.

■ Pursuant to the full faith and credit statute, 28 U.S.C. § 1739, analysis of the above question begins with Pennsylvania law on issue preclusion. Issue preclusion applies in Pennsylvania to bind a litigant to a previous determination of fact or law where the following requirements are met:

(1) the issue decided in the prior adjudication was identical with the one presented in the later action;

(2) there was a final judgment on the merits;

(3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and

(4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Dici v. Commonwealth of Pa.*, 91 F.3d 542, 548 (3d Cir.1996) (citing *Shaffer v. Smith*, 543 Pa. 526, 673 A.2d 872, 874 (1996), and *Safeguard Mut. Ins. Co. v. Williams*, 463 Pa. 567, 345 A.2d 664, 668 (1975)).

*Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357–58 (3d Cir.1999).

In this case, the Debtor disputes the applicability of the second factor, arguing that the Common Pleas Court decision does not constitute a final judgment on the merits. In the literal sense the Debtor is correct, because under Pennsylvania procedural rules issuance of a decision resolving a case does not automatically trigger entry of a judgment. *See* Pa.R.C.P. No. 227.4. Where motions for post-trial relief are filed, as one apparently was by the Debtor, a judgment is not entered until the motions are resolved; in the alternative, if the motions are outstanding in 120 days, a judgment can be entered upon the filing of a praecipe by a party in interest. *Id.* No. 227.4(1)(a) & (b).

The Debtor's position that the decision is not final and binding is supported most strongly by the case of *Dougherty v. Lehigh Coal & Navigation Co.*, 202 Pa. 635, 52 A. 18 (1902), in which the Pennsylvania Supreme Court held that a jury verdict could not be accorded preclusive effect where motions for post-trial relief were filed and undecided. The court stated:

A verdict, when rendered, is under the control of the court in which the case was tried, and the power to set it aside for good reasons must be exercised. Without this power and its exercise in proper cases, justice could not be judicially administered.... [A]t the time she [the defendant] wished to offer it [the jury verdict] in evidence the motion to set it aside was pending. It was then

evidence of nothing at all, except that it had been rendered. It was conclusive of nothing, for the record of which it formed a part showed at the time it was offered in evidence that it might be set aside.... If judgment had been entered on it, it would have been conclusive upon the parties to the issue in which it was rendered of what the jury had found; but with no judgment on it it was inadmissible.

*Dougherty*, 202 Pa. at 638, 52 A. at 18.

While *Dougherty* offers solid support for the Debtor's position, more recent decisions point in a different direction. In *Shaffer v. Smith*, 543 Pa. 526, 673 A.2d 872 (1996), the Pennsylvania Supreme Court addressed the issue of whether a pending proceeding for post-conviction relief disturbed the finality of a prior criminal conviction. The plaintiff in the case was attempting to use the defendant's prior criminal conviction against him to establish liability in a subsequent civil action. The defendant had been convicted following a trial and the conviction was upheld on appeals to the Pennsylvania Superior Court and Supreme Court. Thereafter, the defendant launched a collateral attack upon his conviction by filing a petition under the Post Conviction Relief Act. In the civil action, the defendant argued that the proceeding for post-conviction relief prevented his criminal conviction from constituting a final judgment for purposes of issue preclusion.

The Supreme Court rejected the defendant's claim. The Court began its analysis by looking to and clarifying the general rule applicable to the finality of judgments during the pendency of an appeal. The general rule, stated the Court, is that a judgment is deemed final for purposes of claim and issue preclusion during the course of an appeal. The Court expressly overruled its own prior decision to the contrary in *Columbia Nat'l Bank v. Dunn*, 207 Pa. 548, 56 A. 1087 (1904). The Court then stated it could discern no reason to deviate from the general rule with regard to the defendant's criminal conviction and noted that the result was consistent with section 13 of the Restatement (Second) of Judgments (1980).

In *Greenleaf v. Garlock, Inc.*, 174 F.3d 352 (3d Cir.1999), the Third Circuit held that a Pennsylvania jury verdict was entitled to be considered a final judgment for purposes of issue preclusion, despite the fact that no judgment was entered on the verdict. The plaintiff in the case had previously litigated a products liability action against several asbestos manufacturers in state court in a "reverse bifurcated trial" in which the jury first set the amount of damages and then determined liability. The trial proceeded through its first phase with the jury entering a verdict for a fixed amount of damages. The plaintiff was dissatisfied with the jury's award and filed a motion for additur, but, prior to beginning the liability phase of the trial, the parties entered into a settlement and the case was closed.

The plaintiff later returned to federal court where she had previously filed a similar products liability action against other out-of-state asbestos manufacturers. This action proceeded in the same reverse bifurcated format, with the jury granting the plaintiff an award of damages, this time in excess of the amount awarded in state court, and also determining that at least two of the defendants were liable. On appeal the defendants argued, among other things, that the state court jury verdict on damages had to be regarded as conclusive and that the plaintiff should not have been permitted to relitigate the issue.

The Third Circuit agreed with the plaintiff and held that the state court jury verdict was entitled to preclusive effect. As in the present case, the issue was whether the verdict constituted a final judgment for purposes of issue preclusion. Citing *Shaffer*, the court held that Pennsylvania courts are guided by the Restatement (Second) of Judgment § 13 and analyzed the issue under the standards set forth therein. According to the Restate-

ment, preclusionary rules apply only upon entry of a final judgment, but for purposes of "issue preclusion (as distinguished from merger and bar), [a] 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded preclusive effect." Restatement (Second) of Judgments § 13. The Restatement takes the position that it is better to accord finality to a ruling at the earliest possible stage rather than wait until the litigation of a case comes to completion:

> [To require that] a final judgment in the strict sense has been reached in the first action can involve hardship— either needless duplication of effort and expense in the second action to decide the same issue, or, alternatively, postponement of decision of the issue in the second action for a possibly lengthy period of time until the first action has gone to a complete finish. In particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment.

*Id.* [Restatement (Second) of Judgments § 13 comment g.] Accordingly, the Restatement recognizes that the finality inquiry focuses upon "whether the conclusion in question is procedurally definite." *Id.* Section 13's comments provide a number of factors to be considered in this regard:

> (1) whether the prior decision was "adequately deliberated and firm" and not "avowedly tentative";
> (2) whether the parties were fully heard;
> (3) whether the court supported its decision with a reasoned opinion;
> (4) whether the court's prior decision was subject to appeal or was in fact reviewed on appeal.

*Greenleaf,* 174 F.3d at 358. The court applied the above factors from the Re-

statement and concluded that the jury's verdict was sufficiently definite to be accorded finality for the purpose of issue preclusion. The parties had been fully heard, and the jury's decision was adequately deliberated and firm.

Consideration of these same factors in the present case leads to a similar conclusion with respect to the Common Pleas Court decision. Issuance of the decision signifies that the state court litigation reached a stage at which it can be regarded as procedurally definite under the factors listed in comment "g" of the Restatement. The decision was adequately deliberated and firm, representing the Common Pleas Court's seminal determination on the merits. It is supported by a written opinion issued after a full trial on the debtor's complaint. The opinion was subject to post-trial motions and a potential appeal, and would indeed be at the center of any further proceeding in state court, with Kevin seeking to either overturn or avoid it and Mildred attempting to uphold and enforce it.

Once an adjudication is determined to be final, the Restatement regards it as conclusive regardless of post-trial motions:

> A judgment otherwise final for purposes of the law of res judicata is not deprived of such finality by the fact that time still permits commencement of proceedings in the trial court to set aside the judgment and grant a new trial or the like; nor does the fact that a party has made such a motion render the judgment non-final. This is the case even when a statute or rule of court provides that the judgment cannot be executed upon or otherwise enforced during the period allowed for making such a motion and the further period until the motion if made is decided. The judgment ceases to be final if it is in fact set aside by the trial court, as it would be upon the granting of a motion for a new trial.

*Restatement,* § 13 cmt. f.[1]

The question squarely before the Court, then, is whether to follow *Dougherty* and

---

**1.** The court recognizes that the term "judg- ment" as used in the Restatement may not

rule that the Common Pleas Court decision is not final for purposes of issue preclusion, or whether to follow the guidance of section 13 of the Restatement (Second) of Judgments. The Court is not bound by any of the above cases, because each is distinguishable in some fashion. *Dougherty* is distinguishable since it dealt with a jury verdict rather than a decision issued following a bench trial. The opinion in *Shaffer* is easily distinguishable being that it concerned the effect of a collateral attack under the Post Conviction Relief Act. And even *Greenleaf* is distinguishable on the basis that it involved a jury verdict in a case that was settled and therefore not subject to further review. The Court does, nevertheless, see *Shaffer* and *Greenleaf* as demonstrative of a modern trend in favor of achieving finality and using preclusionary rules to promote efficiency.

The cases also stand for the proposition that Pennsylvania courts place increasing reliance upon section 13 of the Restatement when determining issues of finality. This trend is evident not only from the Supreme Court's decision in *Shaffer*, but also from other Pennsylvania appellate opinions. *Yonkers v. Donora Borough*, 702 A.2d 618, 621 (Pa.Cmwlth.1997); *Shaffer v. Smith*, 436 Pa.Super. 411, 414, 648 A.2d 26, 28 (1994), *aff'd*, 543 Pa. 526, 673

A.2d 872 (1996); *Blake v. Garvin*, 403 Pa.Super. 208, 211, 588 A.2d 553, 555 (1991). In each of these cases the court relied upon section 13 of the Restatement. A trend in favor of the Restatement has been recognized as well by the Third Circuit which in prior cases observed that Pennsylvania law on the finality of judgments was unsettled, *e.g.*, *Bailey v. Ness*, 733 F.2d 279, 281 (3d Cir.1984), but now states that Pennsylvania courts consult section 13 of the Restatement. *Greenleaf*, 174 F.3d at 358; *Linnen v. Armainis*, 991 F.2d 1102, 1107 (3d Cir.1993); *O'Leary v. Liberty Mutual Insurance Co.*, 923 F.2d 1062, 1066 (3d Cir.1991).

Ultimately, however, this Court is most persuaded to abide by the Common Pleas Court decision based on the rationale of the *Dougherty* case itself. The jury verdict at issue in *Dougherty* was deemed nonfinal because the court had not yet ruled on a motion for new trial. Reaching a resolution of the motion was important because, as the court stated: "A verdict, when rendered, is under the control of the court in which the case was tried, and the power to set it asides for good reasons must be exercised. Without this power and its exercise in proper cases, justice could not be judicially administered." *Id.* 202 Pa. at 638, 52 A. at 18. This statement

have the same meaning as the term does in Pennsylvania law. Unlike in the federal judicial system, for instance, where a judgment is entered immediately following issuance of a decision resolving a case, F.R.C.P. No. 58, under Pennsylvania's procedural rules a judgment is not entered until post-trial motions are determined. Pa.R.C.P. No. 227.4(1)(a). The term "judgment" in the Restatement appears based on its usage to coincide with the federal meaning, and thus the Court does not read the term literally when applying the Restatement in the context of Pennsylvania law.

The Court understands the Restatement, however, to indicate that an adjudication is final if it is procedurally definite under the factors indicated in comment "g" of section 13. *Greenleaf*, 174 F.3d at 358. In federal court a case likely reaches the stage of procedural definiteness after a decision is entered deciding the outcome of a case, at which stage a judgment is automatically entered.

R.R.C.P. No. 58. The judgment will then be subject to the filing of post-trial motions for reconsideration or a new trial. F.R.C.P. No. 50(b) & 59. At this same stage of the litigation process in Pennsylvania, a court will issue an opinion or order adjudicating a case, subject to the filing of similar post-trial motions for reconsideration or new trial, Pa. R.C.P. No. 227.1, although the adjudication is not denominated as a judgment. At this juncture, nevertheless, the decision can be viewed as procedurally definite as defined in comment "g," and thus final for purposes of issue preclusion, regardless of the filing of a post-trial motion or an appeal. The Court reads comment "f" of the Restatement as being specifically directed toward this circumstance and hence supportive of its conclusion that an adjudication which is otherwise final remains so notwithstanding the filing of a post-trial motion.

suggests that the outcome in *Dougherty* was substantially driven by the court's concern for the role of the judge in a jury trial to assure that the verdict is legally sound. That concern, however, is all but eliminated in a bench trial where there is no jury verdict, and the courts' decision is rendered by an individual with legal training. In the latter scenario post-trial motions play a different and, for present purposes, perhaps a less significant role.

For this reason, the Court will opt to follow a Restatement analysis and find that the decision of the Chester County Court of Common Pleas is final for purposes of issue preclusion. The application of the other elements of issue preclusion to the State Court's decision appears appropriate and is not disputed by the parties. Both cases concern the identical issue; Kevin was a party to the prior adjudication; and he had a full and fair opportunity to litigate the issue in state court. Thus, this Court is bound to accept the determination of the Common Pleas Court that Kevin has no continuing legal or equitable interest in the residential real estate at 321 Old Morehall Road, Malvern, Pennsylvania, and that the contract of sale for the property is null and void.

## II.

The Court is now positioned to address the question of whether it remains possible under the Bankruptcy Code for the debtor to resurrect the agreement and continue to occupy the premises.

## A.

 The first issue to consider on this subject is the proper classification of the installment sale agreement as an executory contract or security device. On a national basis, cases split on this issue, See for e.g., case cited in *Mitchell v. Streets (In re Streets & Beard Farm Partnership)*, 882 F.2d 233, 234–35 (7th Cir.1989), but in Pennsylvania every bankruptcy court to address the question has classified installment land contracts as security de-

vices. *Bankers Trust Co. v. Grove (In re Grove)*, 208 B.R. 845, 846–47 (Bankr. W.D.Pa.1997); *In re Paveglio*, 1995 WL 465339, *4 (Bankr.M.D.Pa., May 21, 1993); *In re Gochenaur*, 1995 WL 465332, *4 (Bankr.M.D.Pa.1993); *Rowe v. Conners (In re Rowe)*, 110 B.R. 712, 723 (Bankr. E.D.Pa.1990); *In re Capodanno*, 83 B.R. 285, 286 (Bankr.E.D.Pa.1988); *Fox v. Hill (In re Fox)*, 83 B.R. 290, 297–302 (Bankr. E.D.Pa.1988). Pennsylvania Courts have based their conclusions on the principle of equitable conversion which is operable under Pennsylvania law to invest all vendees with equitable title upon execution of a real estate sales agreement, *e.g.*, *Zitzelberger v. Salvatore*, 312 Pa.Super. 402, 405, 458 A.2d 1021, 1022 (1983) ("purchaser becomes equitable owner of the land upon execution of the contract; the seller retains legal title merely as security for payment of the unpaid purchase money"); *Floyd v. Commonwealth of Pennsylvania, Department of Public Welfare*, 47 Pa. Cmwlth. 338, 340, 407 A.2d 1388, 1390 (1979), and upon the case of *Anderson Contracting Co. v. Daugherty*, 274 Pa.Super. 13, 417 A.2d 1227 (1979). In *Anderson Contracting*, the Superior Court specifically held that a real estate installment sale agreement qualifies as a security devise under Act 6, 41 P.S. §§ 101–605, which is a statute that regulates, among other things, residential mortgage foreclosures. *Id.*, 274 Pa.Super. at 22, 417 A.2d at 1232 (we ... conclude that a real estate security transaction, such as the instance land installment contract, should not be denied treatment as a "residential mortgage" solely because the vendor retains legal title as security for payment of the contract price).

The Bankruptcy Court for the Middle District of Pennsylvania which issued the decisions in *Paveglio* and *Gochenaur* also employed the traditional Countryman test to make the determination. Under that test, a contract is considered executory if both parties have continuing performance obligations that are material in nature.

*Enterprise Energy Corp. v. United States (In re Columbia Gas System, Inc.),* 50 F.3d 233, 239 (3d Cir.1995). The Court reasoned that the performance expected of the vendor, to transfer title to the buyer upon payment in full, was ministerial and therefore not a material obligation. *Paveglio,* 1995 WL 465339 at *4; *Gochenaur,* 1995 WL 465332, at *4 ("[D]elivery of legal title is a mere formality and does not represent the kind of significant legal obligation that would render the contract executory") (quoting *Heartline Farms, Inc. v. Daly,* 128 B.R. 246 (D.Neb.1990), *aff'd,* 934 F.2d 985 (8th Cir.1991)). This analysis is consistent with Third Circuit authority which has adopted the Countryman test as the means for identifying executory contracts, *Enterprise Energy,* 50 F.3d at 239, and has also been followed by the Seventh Circuit in *Mitchell v. Streets,* 882 F.2d at 233, wherein the Court also ruled that installment land contracts constitute security devices.

Mildred nevertheless maintains that her agreement of sale with Kevin must be classified as an executory contract because it does not come under the Pennsylvania Installment Land Contract Law, 68 P.S. §§ 901–911. According to Mildred this means that the agreement is not an installment land contract at all. This argument does not withstand scrutiny. The reason the agreement does not come under the Installment Land Contract Law has nothing to do with its substance, but is based solely on the fact that the statute is limited in application to contracts for the sale of land in Philadelphia and Allegheny counties. 68 P.S. § 903(a)(1). The statute does not apply to the parties' agreement due only to this peculiar geographic limitation.

The statute itself recognizes by implication that real estate installment sale agreements exist outside its terms. For instance, section 903(c) of the act, 68 P.S. § 903(c), excludes from coverage installment land contracts entered into with the Administrator of Veterans Affairs. This provision, however, impliedly recognizes the existence of an entire category of installment land contracts not within the act's purview. Similarly, section 909 of the act states that the rights granted therein are "in addition to and not in derogation of any rights of a purchaser under existing law." *Id.* § 909. Again this section implies the existence of installment sale agreements outside the statute, "under existing law." The agreements of sale at issue in the *Paveglio* and *Gochenaur* cases did not come under the act, but the court therein expressed no doubt that the contracts were anything other than real estate installment sale agreements.

There is also nothing in the Common Pleas Court decision to contradict the conclusion that the contract is a real estate installment sale agreement. The Common Pleas Court held merely that the agreement did not come under the act because the property lies outside the act's geographical coverage. The Court recognized, however, that the parties "entered into a valid agreement of sale," *Belmonte,* No. 97–01022, slip op. at 4, which Kevin Belmonte subsequently breached by reason of nonpayment. That breach is the very reason the Court ruled Kevin no longer had an interest in the property. In sum, in view of all of the authorities discussed herein, the Court is confident that the agreement is an installment land contract that should be treated as a security device and not an executory contract.

### B.

That determination leads to the final issue of whether it is possible for Kevin to cure the default and reinstate the agreement in the face of the Common Pleas Court's binding determination that he possesses no legal or equitable interest in the property. The law pertinent to this question is better developed and consistent in relation to mortgages than installment sale agreements. Case law in the Third Circuit had established the date of the foreclosure judgment as the cutoff point after which a

default in a mortgage could no longer be cured in a Chapter 13 plan. *First National Fidelity Corp. v. Perry*, 945 F.2d 61 (3d Cir.1991) (Chapter 13 plan that provided for payment in full of New Jersey mortgage foreclosure judgment over plan period constituted an unlawful modification of the mortgagee's rights under 11 U.S.C. § 1322(b)(2)); *In re Roach*, 824 F.2d 1370 (3d Cir.1987) (following entry of a New Jersey foreclosure judgment it was impossible to cure a default and reinstate mortgage because mortgage no longer existed and reinstatement would constitute an unlawful modification of the mortgagee's rights under the judgment). These cases have since been legislatively overruled by the addition of section 1322(c)(1) to the code, 11 U.S.C. § 1322(c)(1), which definitively sets the date of sheriff's sale as the cutoff point after which a mortgage default can no longer be cured.

Section 1322(c) does not, however, specify the treatment to be accorded installment land sale contracts. Two Pennsylvania bankruptcy courts offer an answer to the question, but differ in their conclusions. In the first case, *In re Rowe*, 110 B.R. at 722, the court addressed the adequacy under Act 6 of a termination notice provided by an installment sale vendor to her purchaser. The agreement in the case, unlike in the present one, came under Act 6 because the purchase price was for less than $50,000. 41 P.S. § 101 (definition of a residential mortgage under Act 6 is limited to mortgages in an initial principal amount of $50,000). *Rowe* observed that the termination notice was inaccurate because it did not correctly inform the purchaser of her right to cure, which under Act 6 lasts up to an hour before sheriff's sale:

> By force of ... [Act 6], ... [the debtor] had until the installment land sale contract analogue of one hour before a sheriff's sale to effect a cure. Since the vendor in an ... [installment sale] transaction remains in title, and no sheriff's sale is necessary, the right to cure

an installment land sale contract presumably extends until one hour before the vendee's interests are cut off. This would not occur, in our view, until there is a court judgment terminating the vendee's rights in the property subject to the ... contract. As a result, the letter fails to accurately set forth the time in which the default must be cured....

*Id.*, 110 B.R. at 722. Recognizing that sheriff's sales are not part of the collection process applicable to installment land contracts, the *Rowe* court applied the Act 6 cure period by analogy, leading it to conclude the cure period ends an hour before entry of a judgment terminating the purchaser's rights. In the context of an installment land contract, the entry of such a judgment is tantamount to a sheriff's sale because it represents the point at which a vendee's underlying equitable interest in the property is extinguished.

Section 1322(c) had not been enacted when *Rowe* was decided, but similar to Act 6 it extends the right to cure up to the time of sheriff's sale. By analogy, in accordance with the reasoning of the *Rowe* court's interpretation of Act 6, the cutoff point for curing a breach of an installment land contract under section 1322(c) is the entry of a judgment terminating the debtor's rights in the property.

Even if section 1322(c) were deemed inapplicable to installment land contracts, the same conclusion is mandated under the Third Circuit's decision in *Roach*, 824 F.2d at 1370. In that case, the Court determined that the right to cure a default in a residential mortgage, subject to the restriction against modification of secured claims under section 1322(b)(2), ends upon entry of a foreclosure judgment. *Id.* at 1377–79. The Court looked to the foreclosure judgment as the pivotal event to end the cure period based on operation of the merger doctrine, which provides, of course, that a mortgage ceases to exist upon entry of a judgment. *Id.* at 1376–78. Because the mortgage ceases to exist and is re-

placed by a new obligation in the form of the judgment, the Court deduced that there was no longer a default to be cured and that the revival of a mortgage following that point would effect an impermissible modification of the mortgagee's rights under the judgment. *Id.*

As applied to a residential installment land contract, this reasoning supports the conclusion that the right to cure must end upon entry of a judgment terminating the purchaser's interest in the property. As with a mortgage, an installment land contract will merge into and be replaced by the judgment, initiating a new relationship between the parties. *See Stendardo v. Federal National Mortgage Association (In re Stendardo)*, 991 F.2d 1089, 1095 (3d Cir.1993). In the case of residential property, any attempt to revive and reimpose the contract upon the seller after entry of a judgment will also effect an impermissible modification of the seller's state law rights.

In relying on *Roach*, the Court is cognizant that the case was decided in the context of New Jersey law and has had less impact in Pennsylvania based on the extended cure rights established under Act 6. *In re Brown*, 75 B.R. 1009, 1011–12 (Bankr.E.D.Pa.1987). In this case, however, Act 6 does not come into play because the instant land contract is for a sale price in excess of $50,000. Moreover, since sheriff's sales are not part of the collection process associated with the enforcement of installment land contracts, the application of the extended cure rights granted by Act 6, which are now also reflected in section 1322(c)(1) of the Bankruptcy Code, do not lead to a different result. *Rowe*, 110 B.R. at 722. Otherwise, the relevant law in Pennsylvania on the doctrine of merger appears to be the same as in New Jersey. *Stendardo*, 991 F.2d at 1095.

The second Pennsylvania bankruptcy case to address the issue is *Grove*, 208 B.R. at 845, which reached a different conclusion, ruling that a debtor has the right to cure a default in an installment land contract past the point of judgment. In *Grove*, a judgment for possession of the premises was entered on the creditor's complaint in ejectment prior to the debtor's bankruptcy filing. The debtor filed an appeal of the judgment and initially obtained a stay pending appeal conditioned on the debtor tendering monthly payments to the creditor. Instead of making the payments, the debtor filed bankruptcy.

Despite the judgment, and in the face of the debtor's failure to meet the state court requirement for obtaining a stay, the Court held that the debtor retained the right to cure the default and reinstate the contract. The Court appears to anchor its decision on the fact that the debtors had not vacated the premises and thus retained a possessory interest in the property:

> Debtors have remained in possession of the property. This fact is relevant to whether Debtors retain any interest in the property. In *In re Atlantic Business and Community Corporation*, 901 F.2d 325 (3d Cir.1990), the Court of Appeals for the Third Circuit held that the possessory interest of a tenant-at-sufferance was "sufficient to invoke the protections of the automatic stay" and that mere possession created a property interest. 901 F.2d at 328. In the case at bar, Debtors' possessory interest is entitled to the same protection. Notwithstanding the judgment for possession entered in favor of Bankers Trust, *Debtors' possessory interest was not terminated prepetition because the property was not sold at foreclosure.* Debtors remained in possession as of the bankruptcy filing date and Bankers Trust was precluded from obtaining possession, first by virtue of the state court order of stay pending appeal and second by the automatic stay. Pursuant to *Atlantic Business,* supra, Debtors' possessory interest is sufficient for denial of relief from stay pending further proceedings in this case.

*Id.*, 208 B.R. at 847 (footnotes omitted; emphasis added).

This Court respectfully disagrees with the reasoning in the above passage. The position that a bare possessory interest in property bestows sufficient rights upon a debtor to reinstate a residential installment land contract is at odds with the authority previously discussed. Section 1322(c)(1), as noted cuts off cure rights at the time of sheriff's sale because that is the point at which a debtor's underlying legal and/or equitable interest in property ends. The occurrence of a sheriff's sale, moreover, is not determinative of a debtor's possessory interest in property, because nothing automatically prevents a debtor from remaining on the premises after it is sold and retaining bare possession, even if the debtor has no right to possession and cannot reinstate his former mortgage.

The *Grove* court observed that the debtor's possessory interest was not terminated because there had been no sheriff's sale. This statement seems incongruous because in *Grove* the conduct of a sheriff's sale was not necessary for the creditor to gain possession of the property (it already had a judgment for possession), and also because, as noted, a sheriff's sale would not prevent the debtor's defiant possessory holdover. The purpose of conducing a sheriff's sale would be to cutoff the debtor's underlying legal and/or equitable interest in the property, but that goal in *Grove* was already been achieved with the entry of a judgment for possession. This Court will thus adopt the conclusion reached in *Rowe*, that the time for a purchaser to cure a breach of an installment land contract expires following entry of a judgment cutting off the purchaser's equitable interest in the property.

As applied to the Belmonte case, the Court therefore concludes that time has expired for Kevin to cure and reinstate the installment land contract on his residence. This result is mandated in view of the binding determination of the Court of Common Pleas that Kevin has no remaining legal, or equitable right, and indeed not even a colorable possessory right, to the premises. It follows that cause exists to grant Mildred's motion for relief from the automatic stay because the debtor has no prospect of retaining the property through Chapter 13.

## CONCLUSION

An order consistent with this opinion will be entered.